IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. THE OSAGE NATION,<br><br>        Plaintiff,<br><br>v.<br><br>1. THE UNITED STATES OF AMERICA,<br>2. THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES 3. DEPARTMENT OF THE ARMY,<br>4. UNITED STATES ARMY CORPS OF ENGINEERS, and<br>5. COLONEL KEVIN R. GOLINGHORST, in his official capacity,<br><br>        Defendants. | Case No. 21 CV-242 JED-CDL<br><br>FILED<br>JUN 0 3 2021<br>Mark C. McCartt, Clerk<br>U.S. DISTRICT COURT |

## COMPLAINT

COMES NOW the Plaintiff, The Osage Nation (the "Nation"), and for its Complaint against the Defendants, the United States of America, the United states Department of Defense, the United States Department of the Army, the United States Army Corps of Engineers (the "Corps") and Colonel Kevin R. Golinghorst, in his official capacity, alleges and states:

### I. PARTIES, JURISDICTION AND VENUE

1. This action seeks judicial review of a final agency action by the Corps that was arbitrary and capricious, not supported by legally required evidence, and in violation of law.

2. The Nation is a federally recognized American Indian tribe, with its Capital located at Pawhuska, Oklahoma, in this judicial district.

3. Defendant Corps is a part of the Defendant United States Department of the Army, which is an agency of the Defendant Department of Defense, which is a Department of the

Defendant United States of America, and pursuant to the Native American Graves Protection and Repatriation Act 25 U.S.C. § 3001 *et seq.* ("NAGPRA"), the Corps has certain statutory and regulatory obligations to the Nation. Defendant Colonel Kevin R. Golinghorst, sued in his official capacity, is Commander of the United States Army Corps of Engineers St. Louis District, whose division, pursuant to NAGPA, issued the final agency action of the Corps for which judicial review is sought.

4. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1362 and 5 U.S.C. § 702 and 703.

5. Upon service of process upon the Defendants, this Court will have personal jurisdiction over the parties.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(c).

II. **THE STATUTORY AND REGULATORY FRAMEWORK AS TO NATIVE AMERICAN REMAINS AND FUNERARY OBJECTS CONTROLLED BY A FEDERAL AGENCY.**

7. In 1990, reflecting the unique relationship between the federal government and Indian Tribes,[1] Congress enacted NAGPRA to ensure the ownership or control of human remains or cultural items excavated or discovered on federal or tribal lands rests with the Indian tribe with the closest cultural affiliation with such remains or objects. That Act and the regulations enacted pursuant to it provide a two-tier process for a federal agency repatriating Native America human remains and funerary objects with the agency's control.

A. **The First-Tier Process.**

8. Pursuant to NAGPRA Section 3003(a), any federal agency or museum "which has possession or control over holdings or collections of Native American human remains and

---

[1] 25 U.S.C. § 3010.

2

associated funerary objects is required to compile and inventory of such items and identify the geographical and cultural affiliation of each item."

9. "Cultural affiliation" is defined in NAGPRA as "a relationship of shared group identity which can be reasonably traced historically or prehistorically between a present-day Indian tribe … and on identifiable earlier group."

10. Pursuant to NAGPRA Section 3005(a)(1), once a federal agency has completed an inventory of human remains and associated funerary objects within its control and a cultural affiliation with a particular Indian tribe is established, the agency is required to expeditiously return the human remains and associated funerary objects to that tribe.

11. Where the federal agency compiling an inventory has not established cultural affiliation, NAGPRA Section 3005(a)(4) expressly requires the agency to expeditiously return such human remains and funerary objects to a requesting Indian tribe when the tribe can show cultural affiliation by a preponderance of the evidence.

12. NAGPRA Section 3005(a)(4) expressly identifies the material provided by a tribe on which a preponderance of evidence of cultural affiliation can be based as "geographical, kinship, biological, archaeological, anthropological, linguistic, folkloric, oral traditional, historical, or other relevant information or expert opinion."

13. NAGPRA Section 3003(a)(2) expressly requires that the agency, upon request by an Indian tribe who receives or should have received notice of the agency process, shall supply additional available documentation to supplement the information possessed by the agency and used in the identification or geographical and cultural affiliation of the human remains and associated funerary objects. NAGPRA Section 3005 requires that upon completion of the inventory process and after consulting with Indian tribes, the federal agency that has control of

Native American human remains and associated funerary objects expeditiously return the human remains and associated funerary objects to the culturally affiliated tribe.

14. NAGPRA Section 3011's required that the Secretary of the Interior promulgate regulations to carry out the Act within 12 months of its enactment, the Secretary of the Interior promulgated those regulations which are contained in 43 C.F.R. §§ 10.1-10.17 (the "Regulations"). The purpose of the Regulations is to develop a systematic process for determining the rights of Indian tribes to certain Native American human remains and funerary objects with which the tribes are affiliated.

15. The Regulations establish that a federal agency must repatriate remains and funerary objects pursuant to two tier, progressive process: (1) identification and repatriation of remains or objects with cultural affiliation to a present-day Indian tribe as prescribed by the statute; or (2) where cultural affiliation cannot be determined, repatriation of culturally unidentifiable remains and objects to the appropriate Indian tribe.

16. In addressing the first tier process the Regulations at 43 C.F.R. § 10.14(c)(2), provide that cultural affiliation is established between a present-day Indian tribe and an identifiable earlier group when evidence supports the existence of similar cultural characteristics or pattern of cultural manufacture.

17. The Regulations at 43 C.F.R. § 10.14(d) further provide that "[a] finding of cultural affiliation should be based upon an overall evaluation of the totality of the circumstances and evidence should not be predicted solely because of some gaps in the record."

18. In addressing what evidence is not required to establish cultural affiliation, the Regulations, 43 C.F.R. § 10.14(f), provide that the standard of proof is "preponderance of the evidence, not scientific certainty."

19. If the tribe requesting repatriation establishes cultural affiliation by the preponderance of the evidence, the agency decision-making process should conclude, and the human remains and associated funerary objects must be expeditiously returned to the tribe.

**B. The Second-Tier Regulatory Process.**

20. Regulations at 43 C.F.R. § 10.11 provide that if cultural affiliation is not determined by the federal agency pursuant to the first-tier statutory process, the process for repatriation of human remains and associated funerary objects which are not culturally affiliated to a present-day Indian tribe is defined by the Regulations.

21. The Regulations at 43 CFR § 10.02(e)(2) define the statutory term "culturally unidentifiable" ("CUI") as human remains and associated funerary objects in museum or federal agency collections for which no lineal descendant or culturally affiliated Indian tribe or Native Hawaiian organization has been identified through the inventory process.

22. Regulations at 43 C.F.R. § 10.11(c)(ii) provide that "aboriginal occupation may be recognized by a final judgment of the Indian Claims Commission or the United States Court of Claims, or a treaty, Act of Congress, or Executive Order."

23. Regulations at 43 C.F.R. § 10.11(c)(ii) prescribe and prioritize the disposition of culturally unidentifiable human remains and associated funerary objects first to the Indian tribe from whose tribal land or reservation the human remains and associated funerary object were removed; and second to the Indian tribe or tribes that are recognized as aboriginal to the area from which the human remains and associated funerary objects were removed.

**C. The Statutorily Created NAGPRA Review Committee.**

24. NAGPRA Section 3006 establishes a review committee of seven members appointed by the Secretary of the Interior. Three members are to be appointed from nominations

submitted by Indian Tribes, Native Hawaiian organizations or traditional Native American religious leaders, with at least two of the three appointees being traditional Indian Religious leaders. Three members are to be appointed by nominations submitted by national museum organizations and scientific organizations. One member is to be appointed from a list of persons developed and consented to by all of the other members.

25. The Review Committee, among its several statutory responsibilities imposed at NAGPRA Section 3006, is to monitor the inventory and identification process conducted under 25 U.S.C. §§ 3003 and 3004 to ensure a fair, objective consideration and assessment of all available relevant information and evidence and, upon the request of any affected party, reviewing and making findings related to the identity or cultural affiliation of cultural items or the return of such items.

    **III.    THE CORPS CONTROL AND DISPOSITION OF THE HUMAN REMAINS AND ASSOCIATED FUNERARY OBJECTS CULTURALLY AFFILIATED WITH THE NATION FROM THE MARK TWAIN LAKE AREA.**

26. Beginning in 1960, the Corps had control of certain Native American human remains and associated funerary objects (collectively, the "Human Remains") that were disinterred from the area of Mark Twain Lake in Monroe and Ralls Counties of Missouri (the "Mark Twain Lake Collection"). The Human Remains of the Mark Twain Lake Collection were collected between 1960 and 1979. In 2015 they were located at the Illinois State Museum in Springfield, Missouri.

27. In 2006, the Corps contracted Steve J. Dasovich, Ph.D. to conduct research and provide a report to determine the federally recognized Native American tribes that may have ancestral ties to human remains discovered in the USACE jurisdictional boundaries in Missouri. The report was titled *Native American Traditional Ranges in Missouri: A Report Prepared in*

*Support of NAGPRA Consultation*. This *Report* is part of the record used by the Corps in its determination described below.

28.     In 2010, the Corps apparently determined the Human Remains were culturally unidentifiable and initiated the process, as provided in 43 CFR § 10.11, for Disposition of Culturally Unidentifiable Human Remains.

29.     On June 9, 2015, the Corps published in the Federal Register (Vol. 80, No. 110) a Notice of Inventory Completion ("NIC"). In that NIC, the Corps stated its conclusion that the Human Remains were culturally unidentifiable and originated from the aboriginal territory of the Sac & Fox Nation of Missouri in Kansas and Nebraska, the Sac & Fox Nation, Oklahoma, and the Sac & Fox Tribe of the Mississippi in Iowa (collectively, the "Sac & Fox Tribes"). None of the Sac & Fox Tribes are currently located in Missouri and none were aboriginally or historically located in Missouri at the time the Human Remains were buried, as dated by the Corps in the NIC.

30.     Prior to publication of the NIC, the Corps was well aware of the Osage Nation's cultural affiliation claim to the region encompassing Mark Twain Lake (the "Region") because the Corps had regular communications with the Nation regarding its concern for both pre-historic and historic ancestral remains and culturally significant sites and burials located throughout the aboriginal territory of the Osage within the jurisdiction of the Corps. In particular, the Nation had consulted with the Corps from 2009 through 2012 on separate NAGPRA issues concerning the Region.

31.     Although aware of the Nation's interest in the Region, the Corps, unlike other federal agencies with whom the Nation has consulted concerning NAGPRA issues, did not discuss with the Nation in the late pre-issuance stage, either the fact that a NIC was to be issued or the draft contents of the NIC.

A. **The Nation's Assertion of Cultural Affiliation.**

32. The human remains and associated funerary objects of the Clarksville Mound Group Site date to the same time-period, Late Woodland and share the same geographic location of the Human Remains disinterred from the Region.

33. Shortly after learning of the NIC's publication, on July 10, 2015, the Nation asserted a cultural affiliation claim requesting priority of the custody over the Human Remains and transfer of control to the Nation of the Human Remains listed in the NIC.

34. In support of its claim the Nation made a detailed 56-page submission to the Corps citing seventy-six references and significant evidence addressing the factors in the Regulations to substantiate its claim of priority based on the Nation's cultural affiliation with the Mark Twain Lake Collection (the "Cultural Affiliation Claim.")

B. **The Corps' Rejection of the Nation's Affiliation.**

35. By letter of September 11, 2015, the Corps rejected the Nation's claims in a "Review of the Evidence Osage Nation's Claim of Cultural Affiliation Mark Twain Lake Section 5 Collections." In that rejection, the Corps inverted the two-tier process:

   a) The Corps claimed that it had consulted with the Nation and that "all documentation and previous determinations prepared by the St. Louis District regarding the Section 5 collections have been transmitted to the Osage Nation through electronic mail and written correspondence." The Corps offered no dates of the alleged consultations, electronic mail and written correspondence and their substance.

   b) The Corps claimed that in 2010 it had made a Culturally Unidentifiable ("CUI") Determination but, did not identify the basis for its CUI Determination. Instead,

       the Corps ignored the Nation's evidence showing cultural affiliation and proceeded to discuss its 43 CFR Part 10.11 CUI process to determine the tribe from whose aboriginal land at Mark Twain Lake collections were made.

    c) The Corps then stated that the land from which the collections were made is within an area ceded by the Sac & Fox in an 1804 treaty and reaffirmed in treaties of 1815 and 1816, and that site from which the collections "originated" are located on land judicially found by the Indian Claims Commission, in a matter to which the Osage Nation was not a party, as being the aboriginal territory of the Sac & Fox. In so doing, the Corps ignored without comment, undisputed evidence that by Treaty with the Osage 1808, U.S.- Osage, Nov. 10, 1808, 7 Stat. 107. US-D, the Osage Nation ceded to the United States "all lands situated northwardly of the river Missouri" which included the sites of disinterment of the Human Remains.

36.    After determining the aboriginal lands, the Corps then asserted that it had reviewed the Nation's claim of cultural affiliation. In so doing, the Corps identified 3 areas of evidence for examination:

> Existence of a present-day Indian Tribe with standing under NAGPRA [§10.14(c)(1)].
>
> Evidence of the existence of an identifiable earlier group. This includes, but is not limited to, (a) evidence which establishes the identity and cultural characteristics of the earlier group, (b) documentation of distinct patterns of material culture manufacture and distribution methods for the earlier group, or (c) establishment of the existence of the earlier group as a biologically distinct population [§10.14(c)(2)].
>
> Evidence of the existence of a shared group identity that can be reasonably traced between the present-day Indian Tribe and the earlier group, thereby establishing that the present-day Indian Tribe

9

> had been identified from prehistoric or historic times to the present as descending from the earlier group [§10.14(c)(3)].

The Corps then identified the various types of evidence that can be used for cultural affiliation determination:

> Affiliation is established when a preponderance of evidence shows a relationship of shared group identity that may be traced historically or prehistorically between a present-day Indian Tribe and the Native American human remains and cultural objects. The following types of evidence can be used — geographical, kinship, biological, archaeological, linguistic, folklore, oral tradition, historical, or other relevant information or expert opinion [§10.14(e)].

37.   In its review, the Corps discussed only one source as to geographic evidence, a person the Corps wrongly labelled as "an Osage Nation historian" whose area of expertise was not discussed and who did not say that pre-contact Osage were absent from the Region at the time of the burial of the Human Remains. Specifically, the Corps did not cite to any statement by the "expert" that the Sac & Fox were present at the time relevant to the burial of the Human Remains. The Corps did not identify any failure of the Nation's geographic evidence to establish cultural affiliation.

38.   In its review, the Corps discussed archaeological evidence. The Nation had submitted evidence indicating a shared cultural in the Region at the time in question and that the shared cultural group shares an identity with the present-day Nation. The Corps conceded a local ceramic tradition existed in the area prior to 450 A.D. Although the Corps claimed that "stylistic ceramic differences point to different groups that influenced each other, rather than a single earlier group," no specific identification of items supporting the Corps conclusion were mentioned.

39.   The Corps did not mention the map of its contractor Dasovich identifying the Osage's presence in Missouri north of the Missouri River, including in the Region.

### C. The Nation's Objection.

40. By letter of May 15, 2016, the Nation responded to the Corps' Review of the Evidence. That Nation's response objected to the Corps' rejection of the Nation's claim of cultural affiliation and accordingly claimed that the Corps' use of the CUI process was invalid. The Nation presented evidence (1) that the Mark Twain Lake area from which the collection of the Human Remains was made, had been ceded by the Osage to the United States by the Treaty of 1808, and (2) that archeological evidence of ceramic assemblages supported cultural affiliation.

41. The Nation in that May 15, 2016 letter also set out as a matter of new evidence that the statutorily-established, independent NAGPRA Review Committee in February 2016 had found that human remains and associated items from the Clarksville Mound site, a Late Woodland and Emerging Mississippian Period site north of the Missouri River and relevant to the Region, were culturally affiliated with the Nation. *See, NAGPRA Review Committee; Findings and Recommendations Regarding Human Remains and Associated Funerary Objects of the Osage Nation: National Park Service*, 81 Fed. Reg. 8219 (February 18, 2016).

42. The human remains and associated funerary objects of the Clarksville Mound Group Site date to the same time-period, Late Woodland and share the same geographic location of the Human Remains disinterred from the Region

43. Consistent with the NAGPRA Review Committee's Finding of the affiliated Late Woodland and Emerging Mississippian Period cultural remains with the Nation of Human Remains found north of the Missouri River, the Missouri State Historic Presentation Office reversed its prior finding and now recognizes the cultural affiliation of remains in that area and time period with the Nation, further discrediting the Corps' central conclusion that the Nation's aboriginal territory was not located north of the Missouri River.

## D. The Corps' Reply.

44. The Corps, on June 10, 2016, responded to the Nation's May 2016 submission. The Corps did not address the new findings by the Congressional created NAGPRA Review Committee. The Corps failed to respond to the Nation's claims of cultural affiliation. Instead the Corps claimed that the Human Remains were culturally unidentifiable and did not originate from Osage Nation aboriginal land.

45. The Corps then reverted to the CUI process as a default mechanism and relied on maps for 1896-1897 identifying Cession by Treaty of another tribe to conclude that since another tribe had ceded the land, the Human Remains are from aboriginal lands of the other tribes. In so doing, the Corps ignored the map of its contractor Dasovich identifying Osage presence north of the Missouri River including the Region and ignored the 1808 Treaty in which the Osage ceded that land.

46. The Corps further supported its conclusion by relying on findings by the Indian Claims Commission ("ICC") in an action to which the Osage Nation was not a party, that the other tribes had ceded "all their rights, title, and interest to the lands described in the 1804 Treaty" and "held exclusive aboriginal title to those areas. As a non-party to that action, the judgment and opinion are not binding on the Nation.

47. On August 16, 2016, the Nation, recognizing the Corps insistence to move forward under the CUI process, requested transfer of control pursuant to 43 C.F.R. §10.11(c)(1), citing the Osage's Treaty of 1808.

48. On August 25, 2016, the Corps responded and stated "the NAGPRA CUI materials from Mark Twain Lake did not originate from Osage Nation aboriginal land"; and further attached a document titled "*Review of the Treaty Lands of Mark Twain Lake.*"

49. The Corps' document wrongfully cited and relied on a source not identified in the Regulations commonly known as the "Royce Maps," which purport to show land cessions to the United States by Indian tribes via treaty.

50. The Corps claimed the Royce Maps show the Sac & Fox Tribes ceded the area surrounding Mark Twain Lake.

51. The Corps knew the Sac & Fox tribes were not in the area during the time periods relevant to the dating of the sites and the Human Remains because the evidence of the record demonstrates *historical* occupation for those tribes.

52. The Corps wrongfully ignored and/or failed to refer to the map of its contractor, Dr. Dasovich identifying the Osage's prehistoric presence north of the Missouri River including the Region in question.

53. Most importantly, the Royce Maps the Corps relied upon were not created to show aboriginal use or occupation of any Indian tribe.

54. The Corps further based its conclusion upon findings by the Indian Claims Commission ("ICC"), an action to which the Osage Nation was a not a party.

55. The Corps' reliance on the ICC decision was misguided because the ICC found the Sac & Fox Tribes had ceded "all their rights, title, and interest to the lands described in the 1804 Treaty"; the ICC further held the Sac & Fox Tribes were not entitled to the full compensation sought because *they did not have exclusive title* to the land in part because "the Osage were the inveterate enemies of the Sacs and this bloody agitation was constant threat to all settlers along the Missouri River." 7 Ind. Cl. Com. 675, 702.

56. The ICC further found "Sac and Fox hostilities with the Osage continued up to the time of the 1805 treaty of cession." 7 Ind. Cl. Com. 675, 704.

57. The Osage Nation was not a party to the Sac & Fox ICC decision; and therefore, the judgment and findings are not binding on the Nation.

58. The Corps failed to review the ICC decisions of the Osage regarding the Treaty of 1808 ceding "all lands situated northwardly of the river Missouri."

59. On September 16, 2016, the Nation's Office of the Attorney General sent a certified letter requesting the Corps halt any repatriation procedures.

60. The Corps did not respond to the Nation's letter until November 2016 and further stated they no longer had control of the Human Remains because repatriation had occurred in September 2016.

## COUNT I

61. The Corps' Decision conclusion that the Human Remains were CUI materials that did not originate from Osage Nation aboriginal land and should not be returned to the Osage Nation constituted final agency action (the "Decision").

62. The Corps' Decision that the Human Remains were not culturally affiliated with the Osage Nation was arbitrary and capricious because it was not based on a consideration of relevant factors and it was a clear error of judgment. Further, it was not supported by legally required evidence and was contrary to law:

> A. The Corps based its Decision on an improper conclusion that ancestral Osage were not located north of the Missouri River. In doing so, the Corps failed to credit specific treaty language and uncontroverted geographic evidence, supported by expert reports, establishing that the Osage ancestrally occupied an area which now includes Mark Twain Lake:

i. The Corps ignored the Tribal Territorial Map, which was commissioned by the Corps' own consultant, Dr. Steve Dasovich. Dr. Dasovich identified the Osage aboriginal territory in Missouri as including the land area now occupied by Mark Twain Lake.

ii. The Corps ignored the language of the United States Treaty of 1808 with the Osage. In the Treaty of 1808, the United States the land north of the Missouri River from the Osage by cession without limitation, including the area that Mark Twain Lake currently occupies.

iii. The Corps did not provide a basis for rejecting the Osage oral traditions reported by professional ethnographers that are consistent with Osage ancestral migration into area of Mark Twain Lake.

iv. The Corps ignored the submitted map of Osage Ceded Land based on treaties with the United States that proves the existence of historic Osage lands north of the Missouri River.

v. The Corps improperly labelled Louis Burns, as "an Osage Nation historian," which he is not and then misapplied his statement that "the pre-contact Osage dominated the area south of the Missouri River, west of the Missouri River, north of the Arkansas River and within the states of Oklahoma and Kansas" as evidence that the Osage did not occupy land north of the Missouri River. In fact, Burns did not make a statement regarding whether the Osage occupied land north of the Missouri River.

vi. The Corps improperly ignored and/or refused to rebut the independent federal NAGPRA Review Committee's finding that the Osage had

presence north of the Missouri River, which finding impeached the Corps' central conclusion on which the Corps' action was based.

B. The Corps refused to credit the archaeological record, supported by experts, that the Osage were present in the Mark Twain Lake area following the ancestral Osage arrival at the confluence of the Mississippi and Ohio Rivers around A.D. 500:

    i. The Corps refused to credit the fact that ceramics of the Salt River Valley north of the Missouri River displayed stylistic influence of the southern area occupied by ancestral Osage and that the ceramics coincided with the arrival of the Osage arrival in the Salt River Valley.

    ii. The Corps refused to credit the evidence of ancestral rock art in Missouri and supporting evidence of cultural affiliation, particularly the site at Picture Cave in Warren County, Missouri that was recognized by the Corps' consultant Dr. Dasovich.

    iii. The Corps refused to credit the evidence of Late Woodland burials in the Mark Twain Lake Area consistent with Osage customs, demonstrating that ancestral Osage are the most likely descendants.

C. Against the record submitted by the Nation, the Corps did not identify any other tribe that would have occupied the Mark Twain Lake area at the time the Human Remains were interred.

D. The Corps did not conclude that the Sac & Fox occupied the Mark Twain Lake area during the Late Woodland Period or other periods of time identified in the NIC.

E. The Corps did not conclude that the Human Remains were culturally affiliated with the Sac & Fox Tribes.

F. The Corps' determination of the Sac & Fox Tribes as the most appropriate claimant, even though that tribe undeniably did not come to the Mark Twain Lake area until centuries after the time dating to the Human Remains, was arbitrary and capricious.

G. The Corps failed to apply the Treaty of 1808 with the Osage Nation to its Decision.

   i. In the Treaty of 1808 the United States recognized by express language that the Osage had claims to land north of the Missouri River.

   ii. In the Treaty of 1808 the Osage ceded all land north of the Missouri River to what is the state line between Iowa and Missouri.

   iii. In the Treaty of 1808 the cession did not exclude any Osage land north of the Missouri River.

   iv. The Treaty of 1808 did not indicate that the Osage lacked claim or occupancy of any land north of the Missouri River.

   v. In its determination, the Corps did not discuss the express language of the of the Treaty of 1808, which conclusively establishes the Nation as the most appropriate claimant of the Human Remains.

H. The Corps' Decision to award the Human Remains to the Sac & Fox was arbitrary and capricious and in violation of the Nation's due process rights.

   i. By relying on decisions of the ICC as to the Sac & Fox, in actions to which the Osage not a party, which decisions did not consider the Treaty

17

of 1808 and did not reach a determination on whether the Osage Nation had a prior claim or affiliation with the Mark Twain Lake area;

ii. By ignoring ICC decisional language in Osage ICC cases limiting ICC decisions to historic occupation rather than prehistoric occupation; and

iii. By relying on ICC decisions as to the Sac & Fox, which were made in error, since reaching its decision regarding land title for Sac & Fox, the ICC relied on certain cession maps (the "Royce Maps"). The drafting process for the Royce Maps purportedly applied treaty language to delineate the boundary lines of land tracts that were ceded or relinquished by Indian tribes. However, the Royce Maps that were drafted for treaty cessions that took place in Missouri failed to consider the language of the Treaty of 1808, whereby the Osage ceded all land north of the Missouri River, including the Mark Twain Lake area.

I. The Corps' determination that the Nation was not the aboriginal tribe in reliance on the Royce Maps was arbitrary and capricious because the Royce Maps ignored the express language of the Treaty of 1808 that ceded lands north of the Missouri River. The language of the Treaty of 1808 is consistent with both the conclusion expressed in the map of the Corps' consultant Dr. Dasovich and the NAGPRA Committee finding of Osage occupation north of the Missouri River.

WHEREFORE, the Plaintiff Osage Nation requests this Court to enter its judgment:

(1) vacating the determination by the Corps that the Nation is not culturally affiliated with the Human Remains and then issuing a

determination that the Nation is culturally affiliated with the Human Remains;

(2) or in the alternative, vacating the determination by the Corps that the Nation is not culturally affiliated with the Human Remains and remanding the matter to the Corps with instructions to the Defendants to reevaluate cultural affiliation of the Human Remains by specifically addressing under the preponderance of the evidence standard the matters identified in this Complaint indicating cultural affiliation of the Human Remains with the Nation;

(3) or in the alternative, vacating the Decision by the Corps and remanding the matter to the Defendants with instructions to exclude from its redetermination for CUI purposes, the ICC decisions to which the Nation was not a party and all maps not utilizing the cession language of the Treaty of 1808 between the Osage and the United States.

By: /s/ Graydon Dean Luthey, Jr.
Graydon Dean Luthey, Jr., OBA No. 5568
**GABLEGOTWALS**
110 N. Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120
Telephone: (918) 595-4800
Facsimile: (918) 595-4990
*dluthey@gablelaw.com*

**ATTORNEYS FOR PLAINTIFF**